Day number 18-2316 Cable Line v. Comcast Cable. Mr. Mandracchia and Mr. Reed. One of the highlights of my sporting career were the Browns won. Haven't done anything since. Take your time whenever you're ready. Good morning, Your Honor. Honors. Thank you for hearing us. My name is Charles Mandracchia. I represent Appellants, Cable Line and McLaughlin Communications. What's the market here, Mr. Mandracchia? The relevant market is the cable installation market, where you have to have your cable, when you call, come in and they install the cable. In other words, what actually happens is you go from assuming it's on the line, not on the ground. You go to the hookup or the tap in on the line. From there, you then go to the house where the meter is for the, I think they call it the. So it's the installers. The K mark and then it goes to the K mark and then it goes into the house and then it splits off into different rooms. I've learned a little bit about cable installation, Your Honor. And so your market analysis, then Comcast forces other installers out of the market. They destroy competition, Your Honor. They had this overall scheme and it was, you know, I understand that. Wouldn't that increase Comcast's costs? Excuse me, Your Honor? Following your market theory to its logical conclusion, wouldn't that increase Comcast's costs? Well, Comcast increased the charge to the consumer 6.5 percent. So there was no logical reason to do this because it didn't benefit anyone because the cost of cable installation rose 6.5 percent and they eliminated all the competition in the geographic market, which is the northeast. What Comcast did is they had this overall plan and they had all these, they went from 177 to 39 across the country, but we're only looking at the northeast region. And what they did is they sent all these cable companies in, built up the infrastructure, had decisive. What they did was they, according to the tying product, would be the cable services and the tied product, according to Jefferson, would then be the cable installation. So what they did is they had. You're mentioning Jefferson now, but it wasn't mentioned in any of the briefs, was it? No, Your Honor, but we got a note from the clerk. Be prepared. Be prepared to talk about it. We'll talk about that later on. What is your, what was your operative theory of antitrust claim? My operative theory is, Your Honor, they went in and they destroyed the market. They destroyed competition. They totally eliminated everyone. They went in and. But your theory is that monopsony or. Definitely monopsony. Horizontal or hub and spoke. Well, the Comcast would be the hub. So that would be the horizontal and then the vertical would be the installation. And so what actually happened was Comcast went in with its monopsony power and went and they decided who they want to buy from. But when they were buying, they set it up for companies to go in and then they destroyed them. They totally eliminated them. And they didn't eliminate them for the benefit. Did that make your claim set up under Section 1, under Section 2 of the Sherman Act? Well, Your Honor, I guess under. It may, but however, Your Honor, if you go into the hub theory, the hub and spoke theory, you do go under both vertical and horizontal. Comcast would be the hub and decisive and Vitel the spokes. And that then you would look at it as a per se analysis. And even under both the Cox Enterprise case and also the Jefferson Parish case, I believe using that you have a tying agreement here. You clearly have a tying agreement between Comcast and decisive where they then go in and Comcast goes in and they build everything together. In other words, there's nothing stopping cable installation companies to do this on their own, to go in, tap in, accept that Comcast does not allow them to tap into their lines. And then they run it as per my description early on as how it operates. And, in fact, the cable installation companies could actually bill the consumer directly with doing that. So all they have to do is pick up the box like they're doing it now, going in, getting the box, setting it up. And they could bill directly. Instead, what Comcast does is they have a tying product. They put the two markets together. What they do is they put the two markets together. If you get a Comcast, you've got to use our installer. Absolutely. I get that, although one might argue pragmatically, don't most customers want to use the Comcast installer? No, Your Honor. And if you look at statistics, people don't like Comcast. They don't like their services. And if you look at the market, they're overworked. All the cable installation services, the labor industry, these people are overworked and the rate of return to the consumer is really poor. In fact, they covered up decisive because of their poor performance. And it's the poor performance that people have the right to have a choice. And when you destroy competition and you don't give people the right to have a choice and you put it together and then you add value, you charge more because what you're doing is you're installing it, Your Honor. You give it to me, Comcast. I then send it to the consumer. They add money on. And so there's no benefit. Even under the rule of reason, there's no benefit to this. People have a right to choose. And this isn't about whether they're ethical or not ethical. It's destroying competition. And they destroyed these. They eliminated the market. They totally eliminated this market of the cable installation. Now, in other areas outside this region, there are other companies you could go to. Like, for instance, down south, you could have went to Time Warner, to Time, and then there's Cox Enterprises, there's Spectrum. There are many. But in this geographic region, all you have is Comcast. Comcast is over 70 percent, and it's actually more because in that 70 percent, in that TV market, you're also having Dish and Satellite and other areas. Comcast is a monopsony, and they went in and destroyed competition. They just totally went in, and we do have standing because of that. I've heard a monopsony claim. You keep coming back to that. Don't you need to be a rival of Comcast in the cable service market, since you're alleging that you have conduct that excludes rivals from that market? That's correct, Your Honor, but Comcast – So how are you a rival of Comcast in the cable service market? Well, it's actually decisive that Comcast then allows Decisive to be that person because what they do is with the tying agreement, with the tying agreement, no one else can get into the market. Decisive is an installer, right? Yes, they are the installer, and it's Decisive that went from $5 million to $48 million in a matter of a couple years just on this matter. If you're talking about tying agreements with exclusivity, that would seem to be Jefferson Parish. Yes, Your Honor. But that's not necessarily what your theory was. Your theory, you do say monopsony, and you keep coming back to it, but it appears that there's a problem making that claim, and I perceive problems in making a hub-and-spoke conspiracy claim. Your Honor, I – I just don't see where you have pled explicitly a tying arrangement between cable services and cable installation. Your Honor, I believe we clearly have, when you draw the relevant inferences to us, Your Honor, all reasonable inference go to the non-moving party, and also to be able to – what this Court has said is that because it's antitrust, that we really need discovery, and this Court frowned upon – But you have to allege, for example, that consumers have an interest in who the cable installers are. Have you alleged that in your complaint? Your Honor, what we allege was that consumers were not happy, and so – and when you also – and that's because part of the standard that Comcast set itself was performance in the cable installation, and when they hire someone that gets rid of 35 percent of their performance, it shows that the consumers are getting bad service, Your Honor. So we did say in our complaint that people are unhappy with Comcast. It says it in our complaint. We cited several articles that people are just totally unhappy with Comcast, and because of that – because they give you a total package, they give you insulation and the cable services, Your Honor, so if I'm unhappy, they're not saying – they're unhappy with the way Comcast performs, which includes insulation and – I'm sorry. Why do I say insulation? Installation. I apologize. Installation. So, of course, they're unhappy, but we said that people were not happy with Comcast, and since Comcast sells the whole package, then you have to include installation. A matter of callbacks, you have to come back, whether they perform properly, how many times do people have to call? You know, when's my guy coming to hook up? When's this coming? I have to be at my house for how many hours a day? Oh, be there Tuesday from 9 a.m. to 4 p.m. Let me ask you about this reverse discrimination claim. Yes, Your Honor. Given the treatment you gave it in the brief, are you still pursuing that? Your Honor, whether this court – it's – Vitel was in there because – No, no, I'm asking if you're pursuing it. Are you pursuing it? You devote less than a page to it. If it's there and we made the elements, of course we're pursuing it, Your Honor. I don't know that it's our strongest claim. I'm talking about an appellate waiver now. Excuse me? I'm talking about an appellate waiver now. You devote less than a page to it. Yes, Your Honor. I do believe – Are you waiving it before – No, no, Your Honor, because I do believe without question that what they did here is they used Vitel because they wanted to create diversity and they were the only – so they needed an African-American company because at that time they were buying Time Warner. And when they were buying Time Warner – Decisive is not minority-owned, is that correct? That's correct. Vitel is. Vitel was minority – is minority-owned. And so they needed Vitel to create diversity. And what they actually did without adding any more African-American companies, by eliminating or cutting down on the number of companies, what they did was they increased their diversity from, I believe it was like 8% and 9%, to like 23% by not adding anyone. So by cutting it down, by cutting down the number of companies, you deceive people saying, oh, now my diversity – I have 23% diversity. So if the argument isn't waived, then why did you only spend less than a page on it? Your Honor, you look at where you think your stronger arguments are and the antitrust I thought was the way they destroyed competition. I believe really needed more of the emphasis because the law was more difficult to proceed with than a reverse discrimination case. And when you destroy so many companies as they did, the destruction of competition with all of these companies, we thought that it was more important for Comcast to understand that they cannot go and just destroy competition in the relevant markets and just run over people, put them in bankruptcy. Would you require then – and I've listened to it all, I've read it all – but would you require that the consumer have the right to determine who the installer will be? Your Honor, under the way – I mean, the way you can hook it up, if you understand the installation of cable, they would have a right to do that. I mean, there's not a problem with doing that because when you have so many companies come in, all you're doing, if you understand the process, is hooking up to the line, then going to the demarked zone and then cutting it out and picking up on Comcast and say, hook it up, turn us on. And so if you have a list of several companies you can choose from, you can save money. It benefits the consumer. Competition benefits consumers because you now have a right to choose. And people then – Right now, the consumer has no right to determine who the installer will be. That is correct, especially because they have the tying agreement. They have the agreement between Comcast and Decisive. And so what they do is they bill it. Comcast, it's one bill. You get your bill, you get your cable services, and then you get your installation. I apologize for people saying installation. It's installation. It's all in one. So you get one bill. I'm sure Comcast adds to it, adds their percentage to it. And, you know, the consumer has no choice. Is the installation charge an ongoing charge? Is it a one-time charge? Well, when you install it, it's a one-time charge, Your Honor, because you come in, you install, but you're still renting the box. But it's a one-time charge. But if you would do the math with Decisive, they go from $5 million to $48 million. They probably do several hundred thousand installations a year, which is a lot. And so consumers would be better off if they have the choice like anything else. This is different than the pirate's case where people don't care about the anesthesiologist. They go in and, you know, you get knocked out and you wake up. But here you're really saving money. The insurance company is not paying. You're paying out of pocket. And we all know that cable services are not cheap. Thank you. Judge Riedberg, any further questions? No, I don't. Okay. We'll hear you back on rebuttals. Thank you. Mr. Ried. Good morning, Your Honors. May it please the Court, Steve Ried from Morgan Lewis on behalf of Comcast Cable Communications of Pennsylvania, Inc. Your Honors, there's a lot that I think I could address here. We've seen what I believe to be a fairly active, moving target. I just want to hit something. When you say it's Comcast Cable, are we only dealing with a Pennsylvania situation or is it a larger area? Well, Judge Greenberg, I think that's a wonderful question. And it's a question that I've asked myself. It goes directly to the question whether the plaintiffs have pled a viable antitrust, a relevant geographic market for purposes of their claims. And what you'll see is that the allegations really vary wildly and are often inconsistent. I'd point you to page five of the plaintiff's brief, which I think is the very definition of gerrymandering. If you look at that almost a half a page long description of what they contend is the relevant geographic market, it winds up being a little bit sarcastic here. I don't mean to be, but it really winds past a couple rivers under a bridge and turns left at a brook. I thought they were alleging that there was Comcast and Market Power in the Freedom, Keystone, and Beltway regions. So, Your Honor, actually, if I could turn to this specific issue, I think it's a little bit more complicated than that. Well, they said the Northern Division at one point, but you could take out western New England and greater Boston and you would end up with what I understand is Freedom, Keystone, and Beltway regions. So, Your Honor, what they do, page five of their brief, they describe what they contend is Comcast Northern Division. Yes, they call it the Northern Division of Comcast, but it's just one division that they say is defined by Comcast, and it really is a gerrymandered map, if you will. They then, at paragraph 23 of their complaint, this is appendix 141, they refer to the Northern Division, and they define that as consisting of or at least including five different regions, and they name what those regions are. Then you get to paragraph 62 of their complaint, it's appendix 147, and they say that Comcast agreed with defendants Vital and Decisive to allocate regional cable installation markets, plural, in three distinct regions within that division. Then you get to paragraph 170 of their complaint, that's appendix 164, and they allege, quote, defendants agreed to allocate the market for cable installation in Pennsylvania, Maryland, Virginia, and West Virginia, not the Northern Division, not any of the regions that they mentioned earlier, and then paragraph 201 of the second of their complaint. But in which areas are Decisive and Battelle the exclusive providers of cable installation? So I don't know that that's alleged. No, I'm just asking as a fact. I don't, it's not in the record, Your Honor, I'm not sure I can tell you accurately as a fact. Well, when you look at the Freedom, Keystone, and Beltway regions, are they the, in those regions, in other words, excluding the Boston and Western New England area, are these two the sole installation providers? What? So, I'm afraid I can't give you a direct answer because I just don't know the fact, but I would respectfully suggest that that's the wrong question for an antitrust analysis, and this goes back to the Third Circuit's decision in Queen City. You have to define, when you're talking about defining... I got you, I'm with you, but I'm just trying to get what region we are talking about. So, I'm trying to work into it. In the Philadelphia area, are these the two the sole installation providers? So, Your Honor, again, it's not in the record, and I couldn't tell you with certainty what the facts are, but I would submit that the plaintiffs, this is their third complaint, their second court. They've been litigating since 2014. They were terminated back in 2012. They have yet to identify what the relevant geographic market is. They have yet to define it by reference to substitute purchasers, which is what Queen City says they must do, and this brings us back to the fundamental, one of the fundamental problems of their case, and this cuts across the various theories that we've heard about today. There's a little bit of a discussion on tying. I want to come back to tying. Well, let's approach this another way. Do you know in what areas Comcast has arrangements with Vattel and Decisive, whereby Vattel and Decisive are the exclusive installation providers? Standing here today, Judge Ambrose, I could not answer that question with confidence. It's not alleged. What I can tell you is that they are cable installers. Again, all of this dispute arises out of competition. It is the opposite of anti-competitive behavior. It is the result of competition. About a year ago, Your Honor, I stood before you and argued the Uber case, and the Uber case, that, by the way, was in front of a class of eighth graders. I think I've graduated now. We have lost a law school class here. But the point is, there and here, that plaintiffs do not have an antitrust claim. They have not suffered antitrust injury. They don't have antitrust standing if they are not harmed as the result of harm to competition. Their harm must flow from harm to competition. In this case, there was competition for Comcast business. There were a number of cable installation companies who sought Comcast business. Two of them won in this area. Two of them did not. The two that did not are suing. Let's deal with this theoretically, then. Let's assume that there is a market that can be identified. And let's assume for the moment, you don't have to agree with this, that Comcast has 70% of that particular market. Would you address under Jefferson Parish why there isn't a tying arrangement? If you're going to get Comcast services, you must use our installers. And we have an exclusive arrangement with only two installers. So under the hypothetical you've identified, let's assume that they've adequately played a relevancy. Let's assume that. And you've further asked me to assume that there is a majority share, arguably market power, in a tying market. Right? Because there's no allegations about market share or market power in the tied market. I got it. Here would be installation. So let me walk through the progression, if I might, on the tying claims. Let me be very clear that the tying claims have not been pled or briefed. Understood. Let's just go with the theoretical. So it is theoretical, but it also is consequential because if they were to bring those claims now, they would be barred by the statute of limitations. Again, I want to get to the merits. The next step, assuming they got past the statute of limitations, which they cannot, the Uber court, the Uber decision instructs that antitrust injury is a requirement for any claim, whether it be tying claim or something else. They would fail because they have failed to plead and have not suffered antitrust injury because their harm flows from the result of competition. They lost out on one customer's business, not harm to competition itself. But if they were able to get past the antitrust injury hurdle, which they cannot, then you look at the merits of a tying case. And this is not the traditional tying case. We're not talking about a company in Comcast that's in the business of selling both the tying and the tied product. There is no forcing going on here. Comcast, they've not alleged it. They couldn't get it. Can a consumer get another installer other than Battelle or Decisive? Well, again, you're hypothetical. I'm going to go outside the record, but I think we've all received self-installation kits. So the answer is yes to a point. There's installation that could be done by third parties. It could be done by you or me in our own homes. The one possible exception, and, again, we'll live in the world of hypothetical because this hasn't played. There's not a factual record. But the one exception to that may be a connection from what's called the hot tab at the street to the house. And that is a connection into Comcast's proprietary network. And the consequences of somebody doing it improperly could have broad impact on service generally. So then you have service concerns. And we get into pro-competitive justifications for a narrow restriction on tapping into Comcast's network at that point. Anything that goes from the house beyond can be done by third parties. It can be done by homeowners. But, again, you won't find any suggestion in the complaint that either customers want broader choice. You won't find any suggestion in the complaint that the plaintiffs sought to sell directly to consumers. In fact, the complaints replete with allegations that their only customer is Comcast. That's the customer they wanted. That's the customer they competed for. That's the customer that they lost. But it isn't really the customer or the consumer of the product. Well, again, it depends. Again, this goes back to why they don't have standards. This is – pardon me. If you have Jefferson Parish and the tying product was the surgical procedures and the tie product was anesthesiology and here you have the tying product as cable service and the tie product as cable installation, why do the – forgetting we'll get to the market in a moment because that's what was the downfall of those who were in Jefferson Parish, but why isn't that a good parallel here in terms of analysis? Nothing more. Well, I mean, I would say for a number of reasons, and I won't recite all the lack of standing and the like. I got it. I got it. But there the allegation was that there was forcing. You come to our hospital, you are forced to use our anesthesiologist services. There's no allegation of forcing in this complaint, and again, with the possible exception of the connection that is – But here, in my hypothetical, you've got in the market, whatever it is, there is 70 percent of it is Comcast-related or is Comcast-controlled. So it would seem that unlike Jefferson Parish where you go to another hospital, here pretty much you've got Comcast or you're not going to have cable. Well, you're not going to have cable, Comcast cable, right? So again, so the allegation I understand is they say 70 percent, and this is something that we've seen throughout this case, and the district court below recognizes that one of the flaws in the plaintiff's complaint is they confuse markets. They refer to market power in one market when they're trying to make a case in a distinct market. And again, what they haven't done, even here, now they have a problem defining a geographic – relevant geographic antitrust market. They also haven't gone through what Queen City says they had to do to plead a relevant product market. So they've drawn a circle around Comcast and said, well, if you want Comcast, Comcast dominates Comcast. Well, that's a truism. We heard a little bit today about cable, about satellites and other options. But again, the best way to test this theory that they've never articulated is to actually have allegations of fact which they've never provided. Is the relevant geographic market the area where Decisive and Battelle are the exclusive providers of cable installations? I don't know why it would be. Again, and this goes back to we heard the term monopsony. And the law is clear in this third section. No, but I'm asking you, is the geographic market the – let's assume Decisive and Battelle are the exclusive providers in an area. Whatever that area is, isn't that the relevant geographic market for that area? I would say that that is an inadequate definition. What would the market be then? So you'd have to go back again to the Third Circuit decision. So what would the market be? The market would be that a geographic market has to be defined by reference to where the sellers seek to sell. In other words, you have to consider reasonable substitute providers. And what happens – let's assume that Battelle and Decisive, wherever the seller decides to sell, the exclusive installers are Decisive and Battelle. Well, no, Your Honor, I wasn't clear. I apologize. You can look to see where they look to sell their services, to whom they look to sell their services. And now I'm talking about the plaintiffs here. The fact is that, again, this goes back to the origin of this complaint was simply that they sought a single customer who was a valuable customer to them. They competed for that business, and they lost. That doesn't mean that they can't install other things. They want to install – this is an improperly and narrowly defined market. If you say we want to – our market is the installation of Comcast cable in three regions of one of Comcast's divisions without regard to other customers. How would you – okay, you're on the other side now. Yeah. How would you draft a complaint that would pass muster, and how would you go about defining the relevant geographic market initially? Well, again, so they don't have any antitrust claims. No, no, I'm asking you if you're on the other side now. So I'm asking you to draft the relevant complaint. No, I understand. What I'm saying is that I couldn't do it because they don't have a viable antitrust claim. They were hurt as a result of competition. Competition was not hurt. If – on specifically on trying to map out – So you're going to say to them, you've got to go elsewhere, you can't come to me. Every day I turn down cases that I don't believe in, and this is one – they simply don't have a case. They've had three complaints. They've had three opportunities to try. The district court judge wrote two very thorough opinions. If there were 30 installers in the market, and you're down to – in a hypothetical case, down to one, and the provider controls 70% to 80% of the market, you're saying there is no viable antitrust claim that can be made? So, again, if you're talking about the 70-80s by reference to a purchaser who has market power, right? And so in the area – in the market in which they operate. What's interesting here is that so Comcast then – this goes back to – I think this is a fundamental point, and it's actually worth reading. This is from the district court opinion. The district court judge said, Comcast has no incentive to conspire with its own subcontractors to eliminate competition in the overall market and increase the prices for the services it was buying. It's a fundamental flaw in their theory, right? It's just simply implausible. We're going back to Twombly now. You have to ask your – so, I mean, there are lots of flaws. They have not adequately pled the existence of an agreement, which is also a fundamental predicate of their claims. This was another independent basis for granting our motion to dismiss. And if you look at actually what they alleged, first of all, there's no allegations of an agreement between the parties at all. Second, there are affirmative allegations in the complaint that refute agreement. It shows that Comcast made its own decision. And then you get to the point, Judge Ambrose, that I think you want to hear, which is it's simply not plausible that Comcast would defeat – act to provide market power to providers from whom it buys things. There's no – You don't think there could be – there could be, in the example I gave, 30 installers. You've eliminated 29, and you must use our installers, and you control 70 to 80 percent of the market. You don't think there could be a possible Jefferson Parish kind of claim? Can't happen. So – and I think there's a number of reasons. Again, look at – ask yourself, what is Comcast's interest here? When the plaintiff's – again, what the – Forget Comcast. Call it X. Right. So in a typical time case, again, there's a financial interest. Either the defendant is trying to profit from using its market power in the time market to get an advantage in the time market, either to achieve market power in that market or to extract super competitive prices in that market to profit from its actions. That's the opposite of what the plaintiffs have alleged here. What they've alleged – I understand that there's issues with what they've alleged. That's not my question to you. Well, but it's also, I think, in the facts. I mean, what they've alleged, and I think it's factually true, is that Comcast – which is an answer to one of your earlier questions. Even in the regions that you were asking about, I have a note that the two co-defendants are not the exclusive installers of Comcast Cable. But what the plaintiffs have alleged is that Comcast doesn't want to be in the business of installation because it's too expensive because of the units. You're saying the Zeiss and the Battelle are not the exclusive installers? Correct. Who else is? Well, we know that Comcast does some installation itself. As I've said, beyond that one trunk line that goes out to the street, consumers themselves can install or they can contract with other third parties. Now, none of this is in the record, Your Honor, you appreciate. But the fact is there are choices. And one of the things, when you look at Cox Cable or you look at Jefferson Parish, one of the questions is, is there really a separate market that's being tied here? You want to look, okay, do consumers want to buy it separately? Do the providers want to sell it separately? Is there forcing going on? Again, none of those allegations are in the complaint. In fact, all of those propositions are contradicted by the allegations. It would seem, and, you know, it's the next case. It may be the next Jefferson Parish case before the Supreme Court type of case. But if you have 30 installers and you go with the lowest, one of the charges, the least, the provider, in this case Comcast, would still charge what it's charging. Therefore, its margin would be greater by going with its lowest cost installation provider. And you say that you must use this installation provider. It would seem that that's the next case that follows up on Jefferson Parish. And you're saying somehow the case makes no sense. Well, Your Honor, Judge Ambrose, there, again, one of the things that traditionally courts do when they're looking at tying is they ask the question whether there are actually two distinct products for these purposes, right? So the example that Jefferson Parish gives, the court in Jefferson Parish talked about. Well, Jefferson Parish was a hospital and somebody who provided a distinct product called anesthesiology. Right. Right. And as you observed, there the plaintiff's claims failed because there was no market power because a patient, another hospital down the road. But one of the examples that the Supreme Court used in that case was flour and sugar. And examples, well, if you go to buy sugar and you're forced to buy flour, then there's forcing going on. You're being forced to buy something that you don't want. Here, there's, again, no allegations, but it also common sense tells you that there's no separate market for Comcast cable installation apart from the desire to access Comcast cable. So what we have here. What they're saying is I don't want that particular installer. But, again, the choice of installers is distinct from when we talk about tying arrangements, we're talking about being forced to purchase a product that you don't want. Look, we're talking about what I said before is really someday the next case. Your Honor, I really do think so. I mean, just to be clear, aside from the fact they haven't pledged, aside from the fact that they couldn't because of the sexual limitations, they just don't have standing to do this. So this might be a case for somebody, but it has to be somebody who has actually suffered antitrust injury. And the law in this Third Circuit, and you contributed to it recently with Uber, really kind of spells out what that requirement is. And they haven't passed muster. They can't satisfy us. Thank you very much. Thank you, Your Honor. Your Honor, the first thing I want to do is clear up some fallacies. Number one, Decisive did not win the RFP because the people which has pled, the people in the field that were determining which companies they would use said they wanted to terminate both Vitel and Decisive, and that is clearly in our brief. The second thing is, Your Honor, unless Decisive had an agreement with them, because what they did was they sent all the cable companies in to build up the infrastructure. I'm sorry. It's just my. No problem. Your Honor, they sent all the cable installation companies in to build up the infrastructure because they had to be prepared. So Vitel and Decisive had to know what they were going to do. What the RFP also did, it gave them the information how many trucks they needed, how many people they needed. So what they did is they had an agreement with Decisive. Just pure logic says that if you're going to do this mass, mass elimination of other subcontractors, you have to have a plan. You cannot not have. I'm sorry. I raised my voice. No disrespect. It's like you're doing it before a jury. That's okay. I'm sorry, Your Honor. I'm animated. I just wanted to apologize. No problem. That they had to have a plan and they had the agreement. And if you look at paragraph 17 of the complaint, the FC. Who's they and what agreement? Okay, Comcast and Decisive. They had to have an agreement. It's a true logic that because you're going to go into all of these areas, the initial cable installation companies went in and built up the infrastructure, spent hundreds of thousands of dollars, millions of dollars. They all went bankrupt because they went in and did it. So now Decisive comes in, the infrastructure is built, and you go in and you take over in these regions, in the Freedom region, in the Harrisburg region. So these regions were clearly, also the geographic regions were clearly defined. Paragraph 17 says, and this isn't Charles Mandrake. This is the FCC. That 75% of households have no competitive available choices among providers, which means they have no available choices, logically follows, cable installation companies. It's a natural progress. One goes with the other. You can't separate them. And to say that, oh, it's going to be bad if you hook up to the cable, that's another red herring because if you look at the labor industry, these people overworked. I mean, it's in the complaint. I know it's not part, and I don't want to get bogged down into the labor and everything, but read it. So that's a red herring because these people overworked. So there's more problems having mistakes with one company than a multitude of competent companies. You want us to demand this matter to the district court for a trial, and what are you going to prove at the trial? Your Honor, what I'm going to prove at the trial is they went in and they destroyed competition. They put 30, 40, 50 companies out of business. They destroyed, and that there is no place to go. They are the only person in these regions, if you can't go to Comcast, Comcast is the only provider for the most part of the cable services, which means the cable installation industry. It goes hand-in-hand. That's why Tyne works so much because it's a hand-in-hand. You can't separate it the way they're doing it. Well, what should Comcast have to do? I mean, does Comcast have to do bidding, or what do they have to do so that they're not in violation of the antitrust laws? Open up competition. Your Honor, what does that mean is they had 30 companies. They had these companies that were very competent. Many of them weren't competent than who they hired. There were seven. They went down to two. Yes. I mean, and most of them outperformed the two that they chose because the one manipulated the performance metrics so that they look better, and even after manipulation, they still didn't get on top. That's not an antitrust claim. I know, Your Honor, that's not an antitrust claim, but when you talk about, when they talk about the RFP, and I agree, and I don't want to do that. When you say open up competition, do you mean that they have to ask for bids from various installers? Your Honor, that would make sense. That's what, anytime you go out, you get bids. You really do get bids. If you look at, if you're a government agency, you have to get the lowest qualified bidder. Yeah, but why couldn't I give my brother-in-law's company, so does my brother-in-law's installer, and why can't I give all my business to him? Well, Your Honor, you can, but you can't destroy competition, and that's the difference. They went in and they destroyed competition. So if you're destroying competition doing that, that's what antitrust is about, is that their actions destroyed competition. It eliminated competition in the relevant geographic market, and that's what antitrust is talking about, and that's what they did. Seventy-five percent. Can I eliminate competition by deciding that I want my brother-in-law to have all this business? Is that an antitrust situation? Your Honor, if you destroy competition, that's what antitrust is about. But also, Comcast, it also, not only did they destroy competition, no one got a benefit except Comcast because it increased 6.5 percent. So you're destroying competition by hiring Joe, your brother-in-law, okay, and you're raising the prices, and everyone else is out of business. That's what antitrust is about, is that you don't destroy competition. I take it you don't like Judge Greenberg's brother-in-law. I don't even know. I'm sure your brother-in-law is the greatest guy in the world. Your Honor, I was a short order cook. I went to the CIA. Anyway, thank you very much. Thank you, Your Honor. Thank you to both counselors for being with us.